ETTIE M. EASTMAN JACKSON et al., Appellees, v. CLARA E. GRANT et al., Appellants.

No. 44251.

MARCH 8, 1938.

REHEARING DENIED JUNE 24, 1938.

Margaret M. Harding, Kindig, Faville & Mathews, and Philip Cockerill, for appellants.

Bennett & Myers and Joseph P. Shoup, for plaintiff-appellees.

Prichard & Prichard, for appellee Wittenmeyer, Admr.

B. H. Morrison, for appellee First State Bank.

STIGER, C. J.—Robert Hornby died intestate February 14, 1920, survived by his widow, Eliza Hornby, and Wilbur Hornby and Minnie Smith, children by a former marriage. At the time of his death, Mr. Hornby was the owner of a 240-acre farm in Monona County and three resident properties in Mapleton,

which real estate was unencumbered and valued at over $50,000 at the time of the death of the decedent. Mr. and Mrs. Hornby occupied one of the resident properties in Mapleton as their homestead which was worth about $3,000. After the death of her husband, Mrs. Hornby continued to occupy the homestead until her death on January 8, 1933.

Seth B. Smith, husband of Minnie Smith, formerly Minnie Hornby, and Wilbur Hornby were appointed administrators of the estate of Robert Hornby in February, 1920, and the estate was closed and the administrators discharged in March, 1921. After the estate was closed, Seth Smith and Wilbur Hornby continued to manage and care for all of the property belonging to the estate until after the death of Mrs. Hornby in 1933 in the same manner as during the year of administration of the estate, carrying on the business as administrators.

In February, 1935, plaintiff, a sister of Eliza Hornby, brought this action in partition as one of her heirs alleging that upon the death of Robert Hornby his widow, Eliza Hornby, took an undivided one-third interest in said real estate, decedent having died intestate, and that such interest descended to her heirs upon her death.

The defendant-appellants, Minnie Smith and Wilbur Hornby, children of Robert Hornby, claimed as a defense to the action that Eliza Hornby had elected to occupy the homestead for life in lieu of her distributive share and that such life estate in the homestead was all the interest she had in the property of her husband.

The trial court found for the plaintiff and a decree was entered which adjudged and decreed that upon the death of Robert Hornby, his widow, Eliza Hornby, became the owner of an undivided one-third interest in his real estate and that Minnie Smith and Wilbur Hornby each became the owner of an undivided one-third interest in said real estate and that the said widow did not elect to take a life estate in the homestead in lieu of her distributive share.

Mrs. Hornby was not granted a widow's allowance and her distributive share was not set off to her during her lifetime.

Other issues were presented and determined in the case, but the only question involved on appeal is whether Eliza Hornby took an undivided one-third interest in the real estate as her distributive share in her husband's estate or, as contended by

appellants, elected to take a life estate in the homestead in lieu of her distributive share.

 Instantly on the death of her husband, an undivided one-third interest and estate in his real estate, that is her distributive share, vested in Mrs. Hornby, which vested estate was subject to be divested by a later election to take the homestead for life in lieu of her distributive share. Van Veen v. Van Veen, 213 Iowa 323, 236 N. W. 1, 238 N. W. 718; Crouse v. Crouse, 219 Iowa 736, 259 N. W. 443. Immediately, upon the death of decedent his surviving spouse and children took as tenants in common. As stated, Mrs. Hornby's vested estate was a defeasible one and the question is whether she divested herself of her said estate by electing to occupy the homestead for life, the burden of establishing said election being on the defendants.

Code section 10146 provides that the survivor may elect to retain the homestead for life in lieu of a distributive share.

No formal election was made and we must turn to the record and determine from the conduct and declarations of the widow and all the facts and circumstances whether she made such election.

After the appointment of the administrators in 1920, they opened an account in the First State Bank of Mapleton designated as "Robert Hornby Estate", which account was continued by the administrators until February, 1935, two years after the death of Mrs. Hornby. Bonds belonging to the estate were sold, the proceeds of the bonds and money and rents received during the period of administration were placed in this account and, after the estate was closed in 1921, all rents and income from the estate were placed in this account. The administrators drew most of the checks against this account during the period from 1920 to 1935, paying the taxes on all the real estate including the homestead and the insurance, repairs, and improvements on all the property and all light, telephone, and water bills of the children and Mrs. Hornby incurred in the use of the estate property. They also looked after the renting of the farm and town properties, had a new corncrib built on the farm, kept the water system on the farm in repair, purchased seed for the farm, leased the property in the name of the Hornby Estate and in general managed all of the property. They also paid the expenses of the last illness and funeral of Mrs. Hornby. Minnie Smith, Wilbur Hornby and his wife and Eliza Hornby drew

checks on this account. The record does not disclose any limitation on their privilege of writing such checks. Seth Smith testified that Mrs. Hornby wrote two checks, and because she was not accustomed to writing checks and transacting banking business, and drawing checks bothered her, that thereafter his wife drew checks on the account giving the money to Mrs. Hornby and the checks were charged to her in the account which was kept by the administrators.

The administrators kept an annual account during the fourteen-year period of all receipts and disbursements made in connection with the estate property. The balance in the account each year was carried over until the next year and no settlement was ever made between Minnie Smith, Wilbur Hornby, and Mrs. Hornby. They borrowed money from time to time from the bank in an amount which reached at one time the sum of $1,600. Proceeds of the notes were placed in the account and the money used for the benefit of all the property, the heirs, and Mrs. Hornby. The notes were paid from the income of the estate property. Mrs. Hornby had no property of her own and was entirely dependent for support on the estate of her husband. The taxes on the homestead property were paid by the administrators each year from checks drawn on the account in the same manner as they paid the taxes on the other real estate belonging to the estate. The administrators paid her telephone, light, and water bills and furnished fuel, groceries, nurse and companion for Mrs. Hornby, insurance and repairs on the homestead, and gave her cash when requested, charging all such expenditures to her in the general estate account kept by them.

After the death of his father, Wilbur Hornby executed a mortgage on his undivided one-third interest of the farm land, though he is now claiming that he at all times was the owner of an undivided one-half interest with his sister, Minnie Smith. A part of the testimony of Seth Smith is as follows:

"After Hornby's death, Wilbur Hornby and myself were appointed as administrators of the estate. He left no will. I think we closed the estate within a year. After Hornby was gone, there was rent to collect, payment on paving and somebody had to take the initiative and I did as if it was my own stuff. I would call my brother-in-law and talk it over and do what was best, and I went ahead and did it just as though we

owned it absolutely, me and Wilbur Hornby. We took care of this stuff from the time Hornby died until now. During the year we were administrators, and up until this suit was filed against us. We rented the farm and collected the rent. After Hornby's death up until we were sued we had, all these years, absolute peaceful possession of everything around there. We collected the rents, paid all the taxes and expenses and repairs with a free hand and done it just as we pleased. No one ever made any objection all these years. We have always kept up the taxes. We have called it the 'Hornby Estate'. It is known that way at the bank. We have had to borrow money. My brother-in-law and I signed the notes. We borrowed money to pay off the tax so that the Mrs. would have that clear and nothing would ever bother her on that. Wilbur Hornby and myself borrowed this money and gave our note, jointly to the bank for it. No one else had anything to do with borrowing the money. No one made any objection to our having full and complete possession of all this real estate the same as our own after Hornby died until this action was brought. We cleared up the paving and taxes on that property. Mrs. Hornby lived right there and continued to occupy that homestead that we got cleared up during all of her life and up to the time she died.''

"Wilbur Hornby was working with me in taking care and managing this property. We worked together. He wrote checks on the estate account and so did I, and I think my wife did and Mrs. Hornby.''

There is no evidence which at all suggests that the money paid out by Seth Smith and Wilbur Hornby as administrators for the benefit of Mrs. Hornby was by way of gift to her on the part of her stepchildren nor do they claim on this appeal that there was a contract or arrangement between them and their stepmother that in consideration of her care and support she would take only a life estate in the homestead. As shown above, the homestead property was worth $3,000, the entire estate about $55,000 and the widow had no property of her own.

Upon the death of her husband, an undivided one-third interest in his real estate vested in Mrs. Hornby, who, with her stepchildren, became the owners of all the real estate as tenants in common. The only fair inference that can be drawn from the evidence is that Minnie and her husband and Wilbur Hornby

and his wife considered, and Mrs. Hornby considered, that she had a right to her share of the income from all the property of her husband as a tenant in common from the time of his death to the time of her death and that the money paid to her by Seth Smith and Wilbur Hornby, with the knowledge of Minnie Smith, was due her as such tenant in common and that the occupancy of the homestead property was as a tenant in common.

The appellants, minimizing the evidence tending to establish that the conduct of the parties was consistent only with a tenancy in common, strongly rely on certain declarations alleged to have been made by Eliza Hornby after the death of her husband. Witnesses testified to the following declarations made by Mrs. Hornby:

"I suggested to her that she go live with the children because I thought she was lonesome. She stated that she and Mr. Hornby talked it over and decided that old people were better off in their own home. She said that Seth Smith looked after everything, that she didn't have to worry as he saw to it that she had everything she needed and she had nothing to worry about."

"She told me after her husband died that she was supposed to stay there and have the say-so of that house as long as she lived and she told me that after she was gone she didn't care what they done with it. She said she would rather stay in her own home."

"She said, 'I always have been alone and had my own way and I am going to stay here so that I can mind my own business.'"

Another witness testified that:

"I asked her why she hadn't went and lived with some of the children so she wouldn't be alone, and she said because her husband told her to stay there as long as she lived and she would always have a home and never to sign her name to anything and that she would always have a home. That when she was through with it, the 'kids' could have it. Seth and Minnie Smith are the only ones she ever spoke of as the 'kids'."

Minnie Smith testified to a conversation between Eliza Hornby and her husband, Seth Smith, in which she took no part:

"I heard her talk to my husband many times about little jobs about the house. She said when she was gone she would like him to have my father's watch as well as all other things that she had. She said she wanted 'you kids' to have what she had when she was through with them. She always told him she always wanted to live in her own home."

Several of the declarations of the widow are consistent with a continued occupancy as a tenant in common.

Title to real property should not be based on these equivocal declarations especially when considered with the evidence of the conduct and attitude of the parties relative to the entire property. In the case of Berry v. Donald, 168 Iowa 744, 747, 150 N. W. 1048, 1050, the question was whether the survivor had elected to take under the will of her husband.

With reference to said declarations of the widow tending to show she elected to take under the will, Justice Evans stated:

"The record before us contains evidence of many casual declarations of the widow to third parties to the effect that she had refused to contest her husband's will at the request of her daughters and that she was satisfied with her husband's will and that she wanted the property left as her husband had left it. Testimony of this nature is usually indefinite and unsatisfactory and the evidence before us is not an exception to such general rule. A court would not be warranted in resting title to property upon such testimony alone."

It does not unequivocally appear that her occupancy was adverse and in denial of any interest of the heirs of decedent in the home. Apparently she was permitted to have the sole occupancy because she was contented there and wanted to live alone and her wishes were respected.

As one witness for appellants stated:

"She wanted to stay there and mind her own business, she had nothing to worry about as Seth Smith looked after everything for her."

There is nothing in the evidence to indicate that the heirs in any manner took the position that she had no right in the remaining property or held such property adverse to her. Mr. Smith looked after everything connected with the entire estate for the

benefit of his wife, Wilbur Hornby, and Eliza Hornby. Mrs. Hornby, having no property of her own, relied on Mr. Smith to see to it that she received her share of the income from the common property and that she got everything that she needed or requested. It is conceded that she had the right to draw on the common fund. It is true that witnesses testified that Mrs. Hornby stated that she wanted to occupy the home as long as she lived and after she was gone she "didn't care what they did with it". She may not have clearly understood the nature of her interest in the property of her husband, but we are convinced, upon a consideration of the entire record, that her occupancy was referable to her tenancy in common with her stepchildren and that she intended to have and claimed her share of the rents and profits from all of the real estate as a matter of right and that the claim was recognized and acceded to by Mr. Smith and the children.

Appellants also contend that the long continued occupancy of the homestead by Mrs. Hornby, a period of thirteen years, alone raises the presumption of an election to occupy the homestead for life, citing Geraty v. Barber, 188 Iowa 690, 176 N. W. 680; Bosworth v. Blaine, 170 Iowa 296, 152 N. W. 567; Stoddard v. Kendall, 140 Iowa 688, 119. N. W. 138; Egbert v. Egbert, 85 Iowa 525, 52 N. W. 478; McDonald v. McDonald, 76 Iowa 137, 40 N. W. 126; Butterfield v. Wicks, 44 Iowa 310, and other cases.

▮▮▮ It is often stated in our cases that the continued occupancy of a homestead is evidence of an election to take the homestead right. However, the occupancy may be as a tenant in common, a life tenant, or under Code section 10145, which gives the surviving spouse, not a property right, but a passive right of occupancy during the administration of the estate until a disposition of the homestead is made, which right has been compared to a widow's allowance. Crouse v. Crouse, 219 Iowa 736, 259 N. W. 443. As the occupancy may be under any one of the several rights, it is not conclusive and the true nature of the occupancy must be determined from all the facts and circumstances surrounding it. The rule is stated in the case of Cornbelt Trust & Savings Bank v. May, 197 Iowa 54, at page 67, 196 N. W. 735, 741, as follows:

"It is conceded that the right to distributive share is the primary right, and that the election must be as to the homestead,

and that the right to the distributive share continues until an election is made. It may be conceded that, as we said in Gray v. Wright, 142 Iowa 225, 227, 119 N. W. 612, and Joslin v. Beam, 187 Iowa 1090, 1099, 174 N. W. 930, ordinarily an election to take the homestead right is evidenced by the continued occupancy of the premises as a homestead by the surviving spouse and family; but this is not conclusive. Whether a widow takes her distributive third right or the homestead right, there is a presumption, in the absence of evidence, that she took the former; and to overthrow the presumption, it must be shown that there was an election to take the homestead. If occupancy is relied upon to show such election, it must be such occupancy as is not only consistent with the homestead right, but an occupancy maintained under and because of such right. In the instant case, we think that the appellant has not established its claim that the widow elected to take her homestead right. Her occupancy thereof is referable to the agreement before stated.

"We think the case is ruled at this point by Bosworth v. Blaine, 170 Iowa 296, 152 N. W. 567, and Joslin v. Beam, supra." See Percifield v. Aumick, 116 Iowa 383, 89 N. W. 1101, 1102.

In the case of Geraty v. Barber, 188 Iowa 690, 176 N. W. 680, 681, which is one of the cases relied on by appellants, the court, in determining whether there was an election, had before it other evidence than the mere fact of occupancy. The court states on page 695 and 696 of 188 Iowa, 176 N. W. 680:

"On the whole record, we are satisfied that the greater weight of the evidence is with the plaintiff, and that she has sustained the burden, and shown that J. B. Barber did elect to take his homestead right, and that all his acts and conduct, with the declarations and other circumstances, are inconsistent with the claim of any other estate in the property. * * * It is true, as contended, that continued occupancy of the premises as a homestead is not conclusive of an election to take the homestead. Gray v. Wright, 142 Iowa 225, 227, 119 N. W. 612; Joslin v. Beam, supra. We said, in the Gray case, that, ordinarily, an election to take the homestead right is evidenced by the continued occupancy of the premises as a homestead. In the instant case, there are circumstances, in addition to the occupancy, which, as we have said, show an election."

In view of the fact that the distributive share is a primary right, and the rule that immediately upon the death of the husband the wife takes a vested undivided one-third interest in his real estate, the statement that continued occupancy of a homestead by a surviving spouse will of itself and without other evidence raise a presumption of an election is not accurate and as stated in the case of Cornbelt Trust & Savings Bank v. May, supra:

"If occupancy is relied upon to show such election, it must be such occupancy as is not only consistent with the homestead right but an occupancy maintained under and because of such right."

With reference to a presumption of an election to occupy the homestead for life, the court in the case of Percifield v. Aumick, supra, states:

"It is sufficient to say that, while the statute gives to the surviving husband or wife the right to elect to retain the homestead for life in lieu of a distributive share in the husband's estate, there is no presumption that the continued occupancy of the homestead is by virtue of such an election, unless it appears that such occupancy is inconsistent with any other right to thus occupy. Egbert v. Egbert, 85 Iowa 525, 52 N. W. 478; In re Franke's Estate, 97 Iowa 704, 66 N. W. 918; Hunter v. Hunter, 95 Iowa 728, 64 N. W. 656, 58 Am. St. Rep. 455."

We conclude that the appellants have failed to sustain their burden of proving that Mrs. Hornby divested herself of her undivided one-third distributive share in her husband's property by an election to take in lieu thereof a life estate in the homestead, and that her occupancy at the time of her death was referable to a tenancy in common in the estate of her husband.

The decree entered by the trial court is correct and the case is affirmed.—Affirmed.

KINTZINGER, SAGER, HAMILTON, DONEGAN, RICHARDS, and MILLER, JJ., concur.